**UNITED STATES of America,**
**Appellee,**
**v.**
**Lionel MARQUEZ, Defendant-Appellant.**
**No. 342, Docket 28579.**

United States Court of Appeals
Second Circuit.

Argued March 11, 1964.

Decided May 14, 1964.

John W. Mills, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, on the brief; Andrew T. McEvoy, Jr., and John S. Martin, Jr., Asst. U. S. Attys., of counsel), for appellee.

Albert J. Krieger, New York City (Theodore Krieger, New York City, on the brief), for defendant-appellant.

Before SMITH, KAUFMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge:

Lionel Marquez appeals from his conviction on a two-count information charging wilful failure to pay the special tax imposed on persons in the business of accepting wagers and failure to register as a person so engaged, based on a jury verdict of guilty. 26 U.S.C.A. §§ 4401, 4411, 4412, 7203, 7262, 7272.[1]

The informations against appellant and seven others were consolidated for trial, and eight were named in a one-count information charging a conspiracy. The substantive counts were first submitted to the jury, which disagreed as to one defendant, found two not guilty, four guilty without a specification of wilfulness and appellant guilty with a specification of wilfulness. Thereafter, Judge Murphy dismissed the conspiracy information as to six of the defendants and declared a mistrial as to appellant and one other defendant. Appellant and three others were then sentenced on the substantive counts.[2]

Appellant's first ground for reversal goes to the sufficiency of the evidence. He claims both that he was not shown to be liable for any of the wagering taxes, because, under the decision in United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957), he was in the category of a "pick-up man" in the numbers operation, and that, in any event, the evidence failed to establish the necessary element of wilfulness to justify conviction of a violation of section 7203.

The Government's case showed that for two months prior to January, 1962, agents of the Internal Revenue Service conducted an exhaustive investigation of reported wagering activities in one block of New York City. The surveillance was by binoculars, cameras and other viewing equipment. During that period one agent, acting undercover, placed wagers with several of the defendants and obtained other incriminating evidence. The undisputed testimony showed an extensive gambling operation, commonly re-

---

1. Section 4401 of the Internal Revenue Code imposes an excise tax on wagering transactions, and makes liable for its payment persons who are "engaged in the business of accepting wagers" and on those who conduct "any wagering pool or lottery." Section 4411 imposes a special $50 tax "by each person who is liable for tax under section 4401 or who is engaged in receiving wagers for or on behalf of any person so liable." Section 4412 requires anyone required to pay special tax to register his name, place of residence, and certain other information with the Internal Revenue Service. Section 7262 provides for a fine of $1,000 to $5,000 to be imposed on persons who are liable for the special occupational tax under section 4411 and fail to pay it; section 7272 imposes a penalty of $50 on persons who fail to register under section 4412. Finally, section 7203, which is a general statute not related solely to the wagering tax provisions, declares that any person required to "pay any * * * tax * * * make a return * * * keep any records * * * or supply any information," who wilfully fails to do the required acts, shall be guilty of a misdemeanor and upon conviction be fined up to $10,000, imprisoned up to one year, or both.

2. One of the defendants did not appear for sentence. His bail was revoked and a bench warrant issued.

ferred to as the "numbers game" in the area. It was stipulated that none of the defendants had ever filed the special occupational tax return, paid the tax, filed a wagering tax return, paid that tax or registered. None of the defendants testified. The only witness for the defense was a retired New York Police Captain who testified as an expert on the operation of the "numbers" business.

The testimony showed further that day after day appellant Marquez was almost constantly in view giving instructions to others as to where to go in the block, where to stand and when to stop taking wagers. He was seen giving an envelope to city policemen in a police car, and using a walkie-talkie to communicate with other persons in the vicinity. He was also seen smoothing out the crumpled sheets showing the wagers made and supervising the daily movement of boxes. On one occasion appellant accepted a wager himself to accommodate a bettor who was in a hurry. The jury might reasonably find from the evidence that appellant supervised the actions of all the persons engaged in handling the bets at this location. There was no direct evidence to show that appellant or any of the defendants knew of the tax and registration requirements.

In United States v. Calamaro, 354 U.S. 351, 353, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957) the Supreme Court recognized the workings of the numbers racket as follows:

"A numbers game involves three principal functional types of individuals: (1) the 'banker,' who deals in the numbers and against whom the player bets; (2) the 'writer,' who, for the banker, does the actual selling of the numbers to the public, and who records on triplicate slips the numbers sold to each player and the amount of his wager; and (3) the 'pick-up man,' who collects wagering slips from the writer and delivers them to the banker. If there are winnings to be distributed, the banker delivers the required amount to the writer, who in turn pays off the successful players."

We cannot agree that only the conclusion that appellant was a pick-up man was possible under this evidence. Calamaro "was a pick-up man for a Philadelphia banker, receiving for his services a salary of $40 a week, but having no proprietary interest in this numbers enterprise." Therefore, both the Court of Appeals and the Supreme Court found that Calamaro "no more receives wagers than a messenger, who carries records of customer transactions from a branch bank to a central office, receives deposits." (354 U.S. at 355, 77 S.Ct. at 1141; 236 F.2d at 184, 185.) The record in the instant case shows convincingly that appellant over a considerable period of time was daily "engaged in receiving wagers," was in control of the operation at the buildings where they were centered, and personally directed the efforts to conceal it.

Although we do not pass on the question whether this evidence might warrant a conclusion that appellant had a proprietary interest in the operation, we think it certainly establishes him as the chief "writer" at the location and hence made him liable for the tax.

With regard to the question of the wilfulness necessary to sustain a conviction under 26 U.S.C.A. § 7203, both parties rely on the Supreme Court's decision in Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). In that case, as in this one, there was no direct evidence to show that any of the four defendants who carried their case to the Supreme Court knew of the tax and registration requirements. All four defendants were convicted of a conspiracy to evade and defeat the wagering taxes imposed by sections 4401 and 4411, in violation of 18 U.S.C.A. § 371 and 26 U.S.C.A. § 7201, and two, Ingram and Jenkins, were convicted of violations of sections 7203 and 7272. Only the conspiracy convictions were challenged in the Supreme Court. The evidence showed that Ingram and Jenkins were the principals in a large-scale numbers operation con-

ducted over a period of years in the city of Atlanta, while Smith and Law, the other two petitioners, were minor clerical personnel employed by the organization which conducted the gambling operation. The conspiracy convictions of Ingram and Jenkins were affirmed while the judgments were reversed as to the others on grounds of insufficiency of evidence. The Court's majority, speaking through Mr. Justice Stewart, said as to Ingram and Jenkins that "they were entrepreneurs in a vast and profitable gambling business. They were clearly liable for the special taxes and registration requirements that the Federal Government has imposed upon the operators of that kind of business. United States v. Kahriger, 345 U. S. 22, 73 S.Ct. 510, 97 L.Ed. 754. Not only did they willfully fail and neglect to pay these taxes, but they conspired to conceal the operation of the business and the source of the income upon which the tax is imposed."

The Court reversed the conspiracy convictions of the other two petitioners, noting that they were not themselves liable for the various taxes imposed on wagering operations. In view of this, there was insufficient proof that Smith and Law knew of the liability of their superiors for the taxes, and hence insufficient evidence that they conspired with Ingram and Jenkins to wilfully evade and defeat those taxes. Such circumstances as "the intimate connection of Smith and Law with the operation of the lottery itself, their cooperation in conducting it secretly, and their apparent knowledge that it was conducted at a profit" were held to be "colorless as to the vital issue of knowledge on the part of Smith and Law that their superiors owed federal wagering taxes."

■■ In the case before us, as in Ingram, the vital issue is knowledge of the wagering tax requirements, which is a prerequisite for conviction of a "wilful" failure to pay the tax and register as it is for a guilty verdict under the conspiracy statute. See United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933); United States v. Martell,

199 F.2d 670 (3 Cir.1952). Marquez's situation differs from that of Smith and Law in Ingram, in that he was personally liable for those taxes, while it differs from that of Ingram and Jenkins in that he does not concede the sufficiency of the evidence to sustain a conviction of the substantive offense of violation of § 7203 of the Internal Revenue Code. On balance, however, we believe the import of the Ingram decision to be that evidence of attempts to conceal the operation of a lottery by one who participates in its operation and is liable for the taxes imposed by Congress suffices to show the element of knowledge circumstantially and to justify conviction of a wilful failure to pay the tax and to register. In this, we are in accord with the great weight of authority on this topic. See United States v. Minker, 312 F.2d 632 (3 Cir.), cert. denied, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963); United States v. Whiting, 311 F.2d 191 (4 Cir.1962), cert. denied, 372 U.S. 935, 83 S.Ct. 882, 9 L.Ed.2d 766 (1963); United States v. Marchionte, 309 F.2d 435 (6 Cir.1962); United States v. Woodson, 303 F.2d 49 (6 Cir.1962); Rosen v. United States, 293 F.2d 938 (5 Cir.1961); United States v. Apuzzo, 245 F.2d 416 (2 Cir.1957). Cf. United States v. Viale, 312 F.2d 595 (2 Cir.1963).

Edwards v. United States, 321 F.2d 324 (5 Cir.1963), *rehearing en banc pending*, on which appellant relies, is not in point. In that case, the evidence showed only that defendants were engaged in a lottery operation and did not register or pay the excise tax. There was no proof of actions designed to conceal the operation by the principals thereof.

Further light on the question of wilfulness in the context of section 7203 is shed by Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943). The question involved here was not directly at issue in that case, its holding being that proof of wilful failure to file a return and pay a tax did not alone justify felony conviction for violation of section 145(b) of the Internal Revenue Code of 1939, the predecessor of section 7201,

although it was sufficient to justify a misdemeanor conviction under section 145 (a) of 1939 Code, the predecessor of section 7203. But the opinion noted that "willful * * * is a word of many meanings, its construction often being influenced by its context," which "may well mean something more as applied to nonpayment of a tax than when applied to failure to make a return." Again, the court indicated that the "affirmative wilful attempt" necessary for a felony conviction "may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime."

■ In this case, the evidence of Marquez's behavior at the site of the gambling operation was certainly such as to establish wilfulness under the Spies rationale, even though the purpose may also have been the concealment of the operation from the scrutiny of city police.

■ Appellant in this court strenuously objects to testimony of government agents concerning his talking to New York City policemen on one occasion and in taking something out of his pocket and giving it to two other policemen on another occasion. No objection was made when the testimony was given. The claim here is both too late and without merit. Evidence of other crimes is admissible when relevant to proof of the crime charged. United States v. Eury, 268 F.2d 517, 520 (2 Cir.1959). Proof of appellant's efforts to conceal the wagering operation was here admissible to show "bad purpose," an element of wilfulness set forth in Spies. The objections to the cross-examination of defend-

ant's expert witness are similarly unfounded.

During the course of its deliberations the jury propounded the following question to Judge Murphy:

"Can you clarify for the jury the question as to which category or categories under the law other than bankers and writers is liable or subject to the 1954 federal law operative in this case?"

He answered:

"The statute that imposes the tax of $50 makes no reference to bankers, to writers, to pickup men. It merely states that there shall be imposed a special tax of $50 per year to be paid by each person who is engaged in receiving wagers either on his own behalf or on behalf of some other person. That's the total statement of who is liable.

"The test is whether the person is engaged in the business of receiving wagers either on his own behalf or on behalf of somebody else. In other words, the tax is imposed on the person who accepts the bet or who has a proprietary interest in the gambling operation, for example, the owner or someone else who is in a supervisory capacity like a boss."

■ Appellant objected that this instruction was improper in the light of Calamaro and Ingram, particularly the language "a person having a supervisory interest such as a boss." Appellant was given an exception. Thereafter, the jury posed another question:

"Can you kindly make the specific distinction embodied in the following question:

"Is it your particular charge to the jury that a person acting in a supervisory capacity in the numbers business is responsible under the law to register and pay the tax in the same fashion as the boss, a person with a proprietary interest, or a person who takes bets?"

Judge Murphy's answer was one word—"No." Thus, the jury was instructed

that a person can act in a supervisory capacity and yet not be liable for the tax. If anything, this charge was more favorable to the defendants than was warranted.

This was clearly a case for the jury. The instructions, including the supplementary charge, were without error. The repeated questions by the jury demonstrated a determination to understand the law involved. The verdict in this type of multiple defendant case—disagreement as to one, guilty with wilfulness as to one, guilty without wilfulness as to four and not guilty as to two—demonstrates careful deliberation and delineation.

The judgment is affirmed.